1
2
3
4
5
6
7

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | | |
|---|---|---|
| DANIEL BELMONTE, | ) | Case No. CV 14-6842-DFM |
| Petitioner, | ) | |
| | ) | OPINION AND ORDER |
| v. | ) | |
| W.L. MONTGOMERY, Warden, | ) | |
| Respondent. | ) | |
| | ) | |

**I.**

**BACKGROUND**

**A.    Procedural History**

On August 1, 2011, a jury convicted Petitioner Daniel Belmonte of carjacking and attempted robbery. 2 Clerk's Transcript ("CT") 280-81. Petitioner admitted the truth of several prior conviction allegations. 2 CT 264. The trial court sentenced Petitioner to a term of 26 years in state prison. 2 CT 334-35.

Petitioner appealed to the California Court of Appeal, raising the following claims: (1) the admission of gang evidence violated his constitutional right to a fair trial; and (2) the admission of Petitioner's former co-defendant's

statement at trial violated his constitutional right to confrontation under Bruton v. United States, 391 U.S. 123 (1968). Respondent's Notice of Lodging, Lodged Document ("LD") 1. On April 29, 2013, the California Court of Appeal affirmed the judgment in a reasoned decision on the merits. LD 2. Petitioner filed a petition for review in the California Supreme Court, which was summarily denied on July 10, 2013. LD 3, 4.

On September 2, 2014, Petitioner filed in this Court a Petition for Writ of Habeas Corpus by a Person in State Custody. Dkt. 1 ("Petition"). The Petition raises the same two claims as raised on direct appeal. Id. at 5, 10-30.[1] On March 19, 2015, Respondent filed an Answer to the Petition. Dkt. 18. Petitioner has not filed a reply.

**B.   Summary of the Evidence Presented at Trial**

The underlying facts are taken from the unpublished opinion of the California Court of Appeal.[2] Unless rebutted by clear and convincing evidence, these facts are presumed correct. Tilcock v. Budge, 538 F.3d 1138, 1141 (9th Cir. 2008); 28 U.S.C. § 2254 (e)(1). Petitioner has not attempted to overcome the presumption with respect to the underlying facts.

On December 17, 2010, shortly after midnight, Andres Flores (Flores) stopped for coffee at a donut shop near Cesar Chavez and Evergreen Avenues in Boyle Heights. As he returned to his vehicle, a Ford Expedition, a woman approached his passenger door and asked for a ride. Flores declined.

As Flores put his keys in the ignition, he opened his car door to retrieve his cell phone in the pocket of the door. A man wearing

---

[1] All citations to the Petition are to the CM/ECF pagination.

[2] In all quoted sections of the Opinion and Order, the term "defendant" has been replaced with "Petitioner."

a blue baseball cap, a light grey or white shirt, and baggy pants approached and demanded his money. The two men scuffled beside the vehicle for approximately ten seconds, when a second assailant approached. The second man was husky, with a shaved head and a mustache.

During the fight, Flores broke free and ran towards the middle of the street. The second man went to Flores's vehicle, got in and drove away. In court, Flores identified Petitioner as the second man. Flores briefly chased the vehicle. He returned to the donut shop and called 911 from the payphone. Flores had scratches on his neck and bruised and bleeding knuckles.

Los Angeles Police Officer Miguel Ruano responded to the scene and interviewed Flores. Flores did not appear to be under the influence. Flores stated that his vehicle was equipped with LoJack. Flores told the officer that the man who demanded money said he had a gun in his waistband, but Flores never saw a gun. Flores described both men as under six feet tall, and around 200 pounds.

Santa Ana Police Officer Daniel Carrillo received the LoJack alert. He and other officers located the Expedition, pulled it over, and detained its occupants. Petitioner was driving the vehicle when it was pulled over. Officer Carrillo found a replica firearm in the front pocket of Petitioner's sweatshirt.

Twelve hours after the carjacking, Los Angeles Police Detective Juan Gonzalez interviewed Flores. Flores did not appear to be under the influence of or "coming down" from any drugs. Flores stated that the first attacker had patted his waistband, indicating that he was carrying a weapon, but Flores never saw a

3

weapon. Flores was not able to identify anyone from several six-pack lineups. Detective Gonzalez investigated the four people who had been in the car when it was recovered, three male and one female. He identified those four as Petitioner, Nancy Mendoza (Mendoza), Salvador "Lonely" Silva (Silva), and Randy "Curly" McGill (McGill). Petitioner was five feet, nine inches tall and weighed 230 pounds; Silva was five feet, eight inches tall and weighed 200 pounds; and McGill was five feet, seven inches tall and weighed 170 pounds.

When Flores recovered his vehicle, it contained a large black jacket, like the one the second man had been wearing. Flores received his keys and cell phone, but was missing his laptop and other files. Flores initially testified that he believed the first man was a lot taller than the second person, around six feet tall, and weighed around 180 pounds. Upon having his memory refreshed, he testified that the first assailant was five feet, ten inches tall and weighed about 210 pounds, with the second assailant five feet, eight inches tall and approximately 200 pounds. On cross-examination, Flores stated he remembered that the first assailant was "quite" taller than him (Flores is five feet, seven or eight inches tall) and the second assailant was shorter.

On January 6, 2011, Los Angeles County Deputy Sheriff Leonel Gomez, a bailiff, was escorting Petitioner and his codefendant, Mendoza, back to lockup after a court appearance. Deputy Gomez observed Petitioner passing some papers to Mendoza. Deputy Gomez confiscated the five pages and turned them over to the District Attorney's Office. The pages ultimately were given to Detective Gonzalez. The five pieces of paper

consisted of a four-page police report and a one-page hand-printed letter to Mendoza from Petitioner.

. . .

Petitioner testified that on December 17, 2010, he was partying at some apartments located on Cesar Chavez Avenue and Savannah Street in Boyle Heights. Petitioner and about eight other men and women were drinking alcohol and smoking marijuana and methamphetamine. Flores approached Petitioner and said he wanted to buy some methamphetamine. Petitioner sold him $20 worth. Flores smoked the methamphetamine in back of the buildings and tried to flirt with Mendoza.

Flores wanted to buy some more methamphetamine, but he did not have money. Petitioner wanted to buy a Christmas tree, so he was going to rent Flores's truck in exchange for more methamphetamine. While Flores was waiting for the drugs, he left for the donut shop.

Petitioner ultimately gave the methamphetamine to his friends, who were going to find Flores. Mendoza, McGill and Silva walked to the donut shop. Petitioner's friends returned in the truck a few minutes later and were going to a Walmart to buy a Christmas tree. After stopping at a gas station, Petitioner got into the driver's seat. Later, Petitioner decided they needed to return the truck to Flores, but they were stopped by Santa Ana police officers before they were able to return the truck. When Petitioner was arrested, the officers found his son's toy gun, which he carried for protection, in the trunk and planted it on him.

Petitioner had seen Flores in the neighborhood before and had even sold him drugs on a prior occasion. He did not take

Flores's Expedition by force and did not know how his friends had obtained the vehicle.

The area where Petitioner was selling drugs was claimed by the Michigan Criminal Force gang. When Petitioner belonged to the gang, it was known as the Michigan Chicano Force gang. Petitioner was no longer active in the gang even though he had some gang tattoos.

Petitioner indicated that he wrote the note to Mendoza because he was unhappy with her statements to the police. He was not trying to convince Mendoza to lie for him, but to tell the truth.

. . .

Detective Gonzalez interviewed Petitioner on December 17, [2010]. The interview was recorded. Petitioner said three times during the interview that he did not know Flores. Petitioner was asked about the gun that was recovered, but he never said it was for protection. Petitioner said Flores handed him the car keys near the donut shop. The recorded interview was played for the jury.

LD 2 at 2-5.

## II.

## STANDARD OF REVIEW

Petitioner's claims are subject to the provisions of the Antiterrorism and Effective Death Penalty Act ("AEDPA"). Under AEDPA, federal courts may grant habeas relief to a state prisoner "with respect to any claim that was adjudicated on the merits in State court proceedings" only if that adjudication:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable

6

determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Overall, AEDPA presents "a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court." Burt v. Titlow, --- U.S. ---, 134 S. Ct. 10, 16 (2013). AEDPA presents "a difficult to meet and highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt." Cullen v. Pinholster, 563 U.S. 170, 131 S. Ct. 1388, 1398 (2011) (internal quotation marks and citations omitted). The prisoner bears the burden to show that the state court's decision "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Harrington v. Richter, 562 U.S. 86, 103 (2011). In other words, a state-court "determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness" of that ruling. Id. at 101 (internal quotation marks omitted). Federal habeas corpus review therefore serves as "a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." Id. at 102-03 (internal quotation marks omitted).

Here, Petitioner raised his claims on direct appeal and those claims were denied by the California Court of Appeal in a reasoned decision. See LD 2. Thus, for purposes of applying the AEDPA standard of review, the California Court of Appeal decision on direct appeal constitutes the relevant state court adjudication on the merits. See Johnson v. Williams, --- U.S. ---, 133 S. Ct. 1088, 1094 n.1 (2013) (noting that federal habeas court "look[s] through" summary denial of claim to last reasoned decision from the state courts to address the claim).

7

# III.

# DISCUSSION

**A.** **Petitioner's Claim Regarding Admission of Gang Evidence Does Not**
**Warrant Habeas Relief**

Petitioner contends that the gang evidence admitted at trial was minimally probative and highly prejudicial, thus violating his right to a fair trial. Petition at 19-29.

**1.      Factual Background**

The state appellate court summarized the trial proceedings that led to the admission of gang evidence as follows:

> During direct examination, Petitioner's attorney asked him why he was carrying a toy gun. The following occurred:
>
> A: The area that I'm in, it's — it's not a good area.
>
> Q: Now, when you say the area, you mean the one that we talked about on the photograph?
>
> A: Yes.
>
> Q: Over there, Cesar Chavez and Savannah?
>
> A: Yes, yes.
>
> Q: And when you say it's not a good area, well, there's people that sell drugs there, aren't there?
>
> A: Right.
>
> Q: And you're one of them, right?
>
> A: Yes.
>
> Q: Okay. Any other bad things happen over there that you know of?
>
> A: A lot of bad things happen, gang members passing by.
>
> Q: Okay. You don't have to tell me specifically, but so why are you carrying that gun?

8

A: For protection.

Q: To protect yourself?

A: Yes.

Prior to the cross-examination of Petitioner, the prosecutor asked for a sidebar, as follows:

[Prosecutor]: Your honor, at this point I think the defense has opened the door for me to inquire about Petitioner's gang affiliation, as well as the affiliation of the gang for his cohort that was there, as well. He testified that the area is not a good area, that there are gang members there and he carries guns for protection, when in fact he is in a gang that occupies that area, so he's talking about his exact — himself. I think for purposes of impeachment and for the jury to get the correct picture of that area and Petitioner's involvement in that area, I think the defense has opened the door for me to inquire into that because the picture that has been painted for the jury at this point is that Petitioner is an innocent character that is just in a bad area, and he carries the gun, and he himself is involved in criminal activity as part of a street gang in that area. That area is occupied by his gang.

[Defense counsel]: I disagree. He hasn't opened the door. He has certainly not painted himself as an innocent party. He's a guy over there in a bad neighborhood where bad things happen, and when you're trying to sell drugs bad things can happen to you. They can steal your drugs or steal your money, and so he's carrying the gun to protect himself because he's doing something illegal. He has far from painted himself from any innocence there who was just trying to protect himself from predators, and there has not been one whiff of any tie to any gang. I don't think that's

opened the door, and I think at this late date it can be so highly prejudicial. I don't even know if he is in the gang right now or active or anything like that. I have nothing prepared in that sense at all or in that regard. I just don't see it.

The Court: He did mention gangs and he did characterize the area. I will allow the People's cross-examination as proposed.

The prosecutor started his cross-examination of Petitioner as follows:

Q: Now, Petitioner, you indicated on your direct examination that the area that is located in this area is an area that is trafficked by gang members; is that correct?

A: Yes.

Q: Okay. It is an area — a gang territory, correct?

A: Yes.

Q: Okay. And what — and you, sir, are part of a criminal street gang, correct?

A: I'm not an active member, but yes.

Q: Okay. You are a part of a street gang by the name of Michigan Criminal Street gang; is that correct?

A: No.

Q: Okay. Well, let me ask you this: you at one point were a Michigan Criminal Street gang member, right? Criminal Force?

A: Yes.

Q: Okay. Now I'm going to show you a series — and your testimony today is you are not an active gang member with this gang; is that correct?

A: Excuse me? I didn't hear you. What?

Q: Your testimony today is that you are not an active

Michigan Criminal Force Street gang member?

A: Yes.

[Defense Counsel]: Your honor, may we approach?

The Court: The question was today. You meant at the time of the incident?

[Prosecutor]: I'm sorry, at the time of the incident. At the time of the incident on December 17, 2010, were you an active member of the Michigan Criminal Force Street gang?

A: No.

After the inquiry, defense counsel requested a sidebar to discuss photographs of Petitioner that the prosecution would seek to introduce. The trial court ruled as follows:

The Court: All right. I have now seen all four, and the word Michigan appears on several of them, MC, which I'm assuming is Michigan Criminals. We'll find out. I've considered under [Evidence Code section] 352, and I don't think that it's more prejudicial than probative. I think it goes directly against his assertion that he wasn't an active criminal street gang member at the time. We do have to keep in mind that there is no gang enhancement, so I am going to allow an inquiry with respect to this, but at some point I'm going to cut it off, so I'm just putting the People on notice.

[Prosecutor]: I also, your honor, want one of the individuals who was arrested who was tattooed up with Michigan Criminal Force.

The Court: Yeah, I think that's relevant because you know they're more likely to be active members if they're hanging out with one another, so I'll allow that, too. But once again, I am

11

going to draw the line because we're going to have a trial within a trial at some point.

[Prosecutor]: I understand. Thank you.

[Defense Counsel]: I'm going to ask to be allowed to inquire, because he was not active, he was working for Homeboy Industries, which, to my understanding, is a bakery, and so I think that I should be allowed to ask that

The Court: I will allow that.

Thereafter, the jury was instructed that it could not consider any gang activity for any other purpose except for the limited purpose of determining whether Petitioner's testimony that he was not active in a gang was believable. The jury was also advised that the evidence should not be used to determine if Petitioner had bad character or was disposed to commit the crime.

LD 2 at 5-9 (internal quotation marks and footnote omitted).

## 2. Decision of the California Court of Appeal

The California Court of Appeal rejected Petitioner's claim as follows:

The trial court properly admits gang evidence when it is relevant to a material issue at trial. (People v. Hernandez (2004) 33 Cal.4th 1040, 1049; People v. Martinez (2003) 113 Cal.App.4th 400, 413.) It is not admissible when its only purpose is to prove "'a defendant's criminal disposition or bad character'" in order to create "'an inference the defendant committed the charged offense.'" (People v. Albarran (2007) 149 Cal.App.4th at 214, 223; accord, Evid.Code, § 1101, subd. (a).)

Assuming arguendo evidentiary error, "the admission of evidence, even if erroneous under state law, results in a due process violation only if it makes the trial fundamentally unfair."

(People v. Partida (2005) 37 Cal.4th 428, 439, italics omitted.) "Absent fundamental unfairness, state law error in admitting evidence is subject to the traditional [People v. Watson (1956) 46 Cal.2d 818, 836] test: The reviewing court must ask whether it is reasonably probably the verdict would have been more favorable to the defendant absent the error. [Citations.]" (Id. at p. 439.) Petitioner has not persuaded us that the trial was fundamentally unfair. As discussed below, it is not reasonably probable the verdict would have been more favorable to Petitioner absent any alleged error.

Even under the more stringent [Chapman v. California (1967) 386 U.S. 18, 24] standard, we find no prejudicial error. The evidence against Petitioner was overwhelming, It is undisputed that Petitioner and his friends were in the Flores's vehicle when they were stopped and arrested. Petitioner's defense that Flores was buying drugs was unbelievable. The officers who interviewed Flores indicated that he was not under the influence of drugs and was not "coming down" from the effect of earlier drug usage. Petitioner's defense was inconsistent. At trial, he testified that Flores lent him the vehicle in exchange for methamphetamine. This was the version he attempted to have Mendoza use in his handwritten letter to her, contrary to her statements to the police. When Petitioner was interviewed after his arrest, he stated that he stayed at the party while his friends went to get the vehicle at the donut shop.

The admission of the limited gang evidence at trial was not as prejudicial as Petitioner's unprovoked carjacking and admission that he was selling drugs at the time of the incident. In light of the

13

compelling evidence against Petitioner and the limited admission
of evidence concerning his gang involvement, reversal is not
required.

LD 2 at 9-10 (footnotes omitted).

### 3.   Discussion

As a preliminary matter, the Court notes that a state court's misapplication of state evidentiary law or of its own precedent, in and of itself, is not a basis for federal habeas relief. Estelle v. McGuire, 502 U.S. 62, 67-68 (1991) ("[W]e reemphasize that it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."); Lincoln v. Sunn, 807 F.2d 805, 816 (9th Cir. 1987) ("Incorrect state court evidentiary rulings cannot serve as a basis for habeas relief unless federal constitutional rights are affected" (citing Givens v. Housewright, 786 F.2d 1378, 1381 (9th Cir. 1986)). Thus, to the extent that Petitioner contends that the trial court's admission of gang evidence violated California state evidentiary law, he fails to state a cognizable claim for federal habeas relief.

Furthermore, although Petitioner argues that the admission of evidence of his membership in the Michigan Criminal Force gang violated his constitutional rights, there is no clearly established Supreme Court law mandating exclusion of this type of evidence. Accordingly, the state appellate court could not have unreasonably applied clearly established federal law when it rejected Petitioner's claim on direct appeal. See Holley v. Yarborough, 568 F.3d 1091, 1101 (9th Cir. 2009) ("Although the Court has been clear that a writ should be issued when constitutional errors have rendered the trial fundamentally unfair, it has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ.") (internal citation omitted); see also Mejia v. Garcia, 534 F.3d 1036, 1046 (9th Cir. 2008) (holding that state trial

court's admission of propensity evidence did not violate clearly established federal law); Alberni v. McDaniel, 458 F.3d 860, 866-67 (9th Cir. 2006) (same).

In addition, a state court's decision to admit specific evidence is not subject to federal habeas review unless the evidentiary ruling violates federal law or deprives the defendant of a fundamentally fair trial. Estelle, 502 U.S. at 75 (finding federal habeas relief inappropriate where admission of evidence was not so unfair as to result in a denial of due process); Dowling v. United States, 493 U.S. 342, 352 (1990) (analyzing "whether the introduction of this type of evidence is so extremely unfair that its admission violates 'fundamental conceptions of justice'" (citation omitted)). The Ninth Circuit has noted that a habeas petitioner bears a "heavy burden" in demonstrating a due process violation on the basis of a state court's evidentiary decision, as he must show that there were "'no permissible inferences'" the jury could draw from the challenged evidence. Boyde v. Brown, 404 F.3d 1159, 1172 (9th Cir. 2005) (quoting Jammal v. Van de Kamp, 926 F.2d 918, 920 (9th Cir. 1991)).

Here, there were permissible inferences that could be drawn from evidence of Petitioner's membership in the Michigan Criminal Force gang, so that its admission cannot be said to have rendered Petitioner's trial so "fundamentally unfair" as to violate due process. Holley, 568 F.3d at 1101. The evidence was admitted for impeachment purposes, that is, to undermine Petitioner's testimony that he was not an active gang member at the time of the charged crimes. In addition, the jury was specifically instructed that it could consider this evidence only for the limited purpose of determining whether Petitioner's testimony that he was not active in a gang was believable. The jury was also advised that the evidence could not be used to conclude that Petitioner had a generally bad character or was disposed to commit the crime. 2 CT 274. A jury is presumed to follow its instructions when reaching a

1    verdict. See Weeks v. Angelone, 528 U.S. 225, 234 (2000) (citing Richardson

2    v. Marsh, 481 U.S. 200, 211 (1987).

3         Finally, even if the Court assumes that the trial court's ruling was clearly

4    contrary to or an unreasonable application of Supreme Court precedent, such

5    an error justifies relief "only if the error had a 'substantial and injurious effect

6    or influence in determining the jury verdict.'" Stark v. Hickman, 455 F.3d

7    1070, 1072 (9th Cir. 2006) (quoting Penry v. Johnson, 532 U.S 782, 795

8    (2001)); see also Brecht v. Abramson, 507 U.S. 619, 637 (1993). Such a

9    showing is not made where the evidence of guilt is, "if not overwhelming,

10   certainly weighty" and "other circumstantial evidence[ ] . . . also point[s] to

11   petitioner's guilt." Brecht, 507 U.S. at 639.

12        Here, it cannot be said that any alleged error had a substantial and

13   injurious effect or influence on the jury's verdict. Flores testified that he was "a

14   hundred percent sure" that Petitioner was one of the carjackers. 3 Reporter's

15   Transcript ("RT") 616; see also 2 RT 349. Petitioner was driving Flores's car

16   when he and his friends were stopped and arrested. 3 RT 653-54, 658.

17   Petitioner's defense that Flores was buying drugs was undermined by the

18   officer who interviewed Flores, who testified that he was not under the

19   influence of drugs and was not "coming down" from the effect of earlier drug

20   usage. 3 RT 632-35. Petitioner also gave conflicting versions of events. For

21   example, he testified at trial that Flores lent him the vehicle in exchange for

22   methamphetamine. 3 RT 747-49, 750, 751-53, 788, 792-95, 798; 4 RT 960-62.

23   This was the same version he attempted to have Mendoza use in his

24   handwritten letter to her, contrary to her statements to the police. 2 CT 178; 2

25   RT 327. However, when Petitioner was interviewed after his arrest, he told

26   police that he stayed at the party while his friends went to get the car at the

27   donut shop. 4 RT 974. In addition, he testified at trial that he recognized

28   Flores and had sold him drugs on prior occasions. 3 RT 764-65; 4 RT 919.

16

However, when interviewed by police, Petitioner repeatedly stated that he did not know Flores. 4 RT 973. Accordingly, given the weighty evidence presented at trial, it cannot be said that any alleged error in admitting the gang evidence had a substantial and injurious effect on the verdict. Petitioner is therefore not entitled to habeas relief.

## B.  **Petitioner's _Bruton_ Claim Does Not Warrant Habeas Relief**

Petitioner argues that his Sixth Amendment right to confrontation was violated by the admission of co-defendant Mendoza's statements to police. Petition at 29-35.

### 1.  **Factual Background**

The state appellate court summarized the background of this issue as follows:

> Mendoza, representing herself, received discovery from prosecution, including police reports. One police report summarized Mendoza's statements to the police, after she was arrested, as follows: "Mendoza stated she was walking with Chino by the donut shop at Cesar Chavez and Evergreen. Lonely and Curley [sic] were 'posted up' nearby. The victim approached her in the parking lot and asked in Spanish, 'Do you want to fuck?" He also asked if he could buy some drugs. She refused his solicitation and Chino thought this was disrespectful. The victim was walking in[to] the shop as she looked in his vehicle and saw the keys. Mendoza said she told Chino that they should take the truck. There was an altercation, at which time she got in the left rear seat, Chino got in the driver seat, Lonely in the front passenger seat. They drove over to Curly and picked him up. They then drove to the 710 freeway south to the eastbound 91 freeway then southbound 5 freeway. Mendoza stated they got lost, but

17

remembers passing Disneyland. They stopped at an unknown gas station to get cigarettes, and she changed seats with Lonely so that she could help navigate. Mendoza said they observed the police following them, and that Curly wanted to run. She told them to pull over because they would get caught by a police dog if they ran. Mendoza said she saw the toy gun on the rear floor of the vehicle when she was seated in the back. She took a black cell phone that was in the front passenger door. She also remembers seeing a wallet. Mendoza advised the phone was in her property taken by police. She denied being a gang member and stated that the other defendants were . . . (Michigan Criminal Force) gang members."

During a prior court appearance, Petitioner tried to hand several pages to Mendoza while they were in lockup. In addition to police reports, which included Mendoza's statement, there was a one-page letter handwritten by Petitioner to Mendoza, as follows: "Nancy . . . Ok check this out on your statement to the cops. Your gonna say they told you what to say before going into that room where you 'told nigga!' I know Curly made you say that shit[.] He has something coming from me. Anyways this is it. Did you get my letter? Ok me, Curly, Lonely, Dee, Steph and about 3 other bitches are gonna say we were all kicking back at the apt's[.] D-end and Andres aka "Andrew Flores" was partying with us. He ran out so he asked if he could trade his truck for a few hours for some meth. He propositioned but you said chale so he went to go smoke in the back of the apt. Me[,] Curly [,] you[,] Lonely left. We were gonna get a xmas tree for me at Wall Mart [sic]. They should let us go home next month. Don't break. Be strong."

18

Petitioner's counsel objected when the prosecutor started to read Petitioner's letter during opening statements to the jury. The trial court overruled the objection, finding that Petitioner wrote the letter so it was admissible under Evidence Code section 1220 as an admission by a party.

During Petitioner's testimony, outside the presence of the jury, the prosecutor stated that he intended to confront Petitioner with the contents of the letter. The prosecutor also indicated that he intended to confront Petitioner with Mendoza's statements to the police, contained in one of the police reports in Petitioner's possession. Petitioner's attorney initially objected that the Mendoza statement was "hearsay on hearsay of what . . . Mendoza may or may not have told the police." The prosecutor responded that Mendoza's statements to the police were not offered for the truth of what happened, but to explain why Petitioner wrote the letter to Mendoza.

After the prosecutor discussed Petitioner's own handwritten letter with him, he started to review Mendoza's statements to law enforcement. The trial court interrupted, and advised the jury as follows: "Ms. Mendoza's statements to the police in the police report that are about to be narrated are not to be accepted by the jury for the truth of the matter, that what she said is the way that the incident actually happened. It is to be considered only as evidence that the defendant tried to create false evidence or obtain false testimony."

After the trial court's ruling, the prosecutor discussed Mendoza's statements to the police with Petitioner. On redirect, defense counsel also discussed Mendoza's statements with

Petitioner. Petitioner indicated that the letter actually asked Mendoza to tell the truth, and not lie about the incident.

LD 2 at 10-12.

### 2.    Decision of the California Court of Appeal

The California Court of Appeal denied Petitioner's <u>Bruton</u> claim as follows:

> Petitioner contends that the admission of Mendoza's statements violated his confrontation rights under <u>People v. Aranda</u> (1965) 63 Cal.2d 518 and <u>Bruton v. United States</u> (1968) 391 U.S. 123 [88 S.Ct. 1620, 20 L.Ed.2d 476]. In <u>Aranda</u>, the California Supreme Court held that when a prosecution intends to offer the extrajudicial statement of one defendant which incriminates a codefendant, the trial court must either grant separate trials, exclude the statement, or excise all references to the nondeclarant defendant. (<u>Aranda</u>, <u>supra</u>, at pp. 530-531.) Under <u>Bruton</u>, " ' [A] defendant is deprived of his Sixth Amendment right of confrontation when the facially incriminating [statement] of a nontestifying codefendant is introduced at their joint trial, even if the jury is instructed to consider the confession only against the codefendant.' " (<u>People v. Mitcham</u> (1992) 1 Cal.4th 1027, 1045, quoting from <u>Richardson v. Marsh</u> (1987) 481 U.S. 200, 207 [107 S.Ct. 1702, 95 L.Ed.2d 176].)

> Because Mendoza pleaded no contest before the joint trial, Petitioner's <u>Bruton</u> claim lacks merit. <u>Bruton</u> is inapplicable when the defendant's accomplice's trial is severed or, as in the instant case, pleads no contest before trial. (<u>People v. Richardson</u> (2008) 43 Cal.4th 959, 1007.) "'<u>Bruton</u> and its progeny provide that if the prosecutor in a joint trial seeks to admit a nontestifying

codefendant's extrajudicial statement, either the statement must be redacted to avoid implicating the defendant or the court must sever the trials. [Citation.]'" (Ibid.)

The People point out as well that Bruton's scope was limited in Richardson v. Marsh, supra, 481 U.S. 200. The court held that when a nontestifying codefendant's confession is redacted so that it does not facially incriminate the defendant and the statement is incriminating only when linked with evidence introduced later at trial, the admission of the statement with a proper limiting instruction will not violate the confrontation clause. (Id. at pp. 207-208, 211.) Under such circumstances, the court could properly presume that jurors would follow a limiting instruction not to consider the confession against the defendant, even if the confession incriminated the defendant when considered in connection with other evidence. (Id. at pp. 201-202, 208.)

The People contend that Mendoza's statement does not facially incriminate Petitioner, citing the following portion of Mendoza's statement: "The victim was walking into the shop as [Mendoza] looked into his vehicle and saw the keys. Mendoza said she told Chino that they should take the truck. There was an altercation, at which time she got in the left rear seat, Chino got in the driver seat, Lonely in the front passenger seat. They drove over to Curly and picked him up." The People contend that the statement does not facially implicate Petitioner because Mendoza did not identify any participants involved in the altercation. Further, the court could properly presume that jurors would follow a limiting instruction not to consider the confession against the defendant, even if the confession incriminated the defendant when

21

considered in connection with other evidence. (<u>Richardson v. Marsh</u>, <u>supra</u>, 481 U.S. at pp. 201-202, 208.)

Petitioner, in countering this argument, states that Mendoza's statement does not create a doubt as to what Mendoza meant and directly implicated him in the crime. In addition, the trial court characterized the statement as "extremely inculpatory."

Whether or not Mendoza's statement facially incriminated Petitioner, if there was <u>Bruton</u> error, it was harmless. The "analysis generally depends on whether the properly admitted evidence is so overwhelming as to the guilt of the nondeclarant that a reviewing court can say the constitutional error is harmless beyond a reasonable doubt." (<u>People v. Archer</u> (2000) 82 Cal.App.4th 1380, 1390.) The victim identified Petitioner as one of the carjackers. Petitioner was driving the vehicle when it was stopped by the police. Petitioner's defense that the victim was purchasing drugs was not believable. Petitioner's statement to law enforcement after his arrest and testimony at trial were inconsistent. The properly admitted evidence was overwhelming as to Petitioner's guilt.

We note as well that the trial court did not err in ruling that Mendoza's statements to the police were not hearsay. A statement is not hearsay if it is relevant to an issue in the case "'merely because the words were spoken ..., and irrespective of the truth or falsity of any assertions contained in the statement." (<u>People v. Fields</u> (1998) 61 Cal.App.4th 1063, 1068.) As the trial court properly instructed the jury, Mendoza's statements were relevant and admissible "as evidence that the defendant tried to create false evidence or obtain false testimony," without regard to the truth or

falsity of those statements.

We also reject Petitioner's claim of cumulative error. Any error was harmless, and any cumulative effect did not infringe on Petitioner's constitutional rights. (<u>People v. Osband</u> (1996) 13 Cal.4th 622, 688.)

LD 2 at 12-14.

### 3.   Analysis

Petitioner's claim of <u>Bruton</u> error is without merit. In <u>Bruton</u>, the Supreme Court held that a defendant is deprived of his rights under the Confrontation Clause when his nontestifying co-defendant's confession naming him as a participant in the crime is introduced at their joint trial, even if the jury is instructed to consider that confession only against the co-defendant. 391 U.S. at 135-36. The California Court of Appeal correctly determined that <u>Bruton</u> was not applicable here because Mendoza pleaded no contest before trial and was therefore not tried jointly with Petitioner. <u>See, e.g.</u>, <u>Scott v. Felker</u>, No. 06-1147, 2008 WL 5411477, at *9 (N.D. Cal. Dec. 29, 2008) ("<u>Bruton</u> is not applicable here because Petitioner was not tried *jointly* with those who made the inculpatory statements.").

Furthermore, the <u>Bruton</u> rule only applies to hearsay statements, not to statements that are offered for some other, nonhearsay purpose. <u>See, e.g.</u>, <u>Quintana v. Hedgepeth</u>, No. 08-6482, 2009 WL 2900333, at *16 (C.D. Cal. Sept. 3, 2009) (concluding that <u>Bruton</u> was not implicated where the co-defendant's statement was not admitted for the truth of the matter asserted, but rather as circumstantial nonhearsay evidence of consciousness of guilt). No constitutional violation occurs when a nontestifying accomplice's facially incriminating confession is introduced for a proper nonhearsay purpose. <u>See</u> <u>Tennessee v. Street</u>, 471 U.S. 409, 413-14 (1985).

///

23

Here, Mendoza's statements to police were not offered for the truth of the matter asserted, that is, that Mendoza's account of the crime was true. Rather, Mendoza's statements were introduced solely to explain why Petitioner sought to have Mendoza provide false testimony at trial.

Even if the Court assumes that admission of Mendoza's statements to police violated <u>Bruton</u>, habeas relief is not warranted because the admission of Mendoza's statements was harmless. <u>See</u> <u>Lilly v. Virginia</u>, 527 U.S. 116, 139-40 (1999) (holding that a <u>Bruton</u> error claim, like any other Confrontation Clause claim, is subject to harmless error analysis); <u>Brecht</u>, 507 U.S. at 637-38. As discussed above, the evidence introduced at trial against Petitioner was strong: Flores identified Petitioner at trial; Petitioner was arrested driving Flores's car; his defense that Flores lent him his car in exchange for drugs was not believable; and he gave conflicting statements. Thus, it is not reasonably likely that any alleged <u>Bruton</u> error had a substantial and injurious effect on the jury's verdict. Moreover, the trial court admonished the jury that it could only consider Mendoza's statements for the limited purpose of determining whether Petitioner tried to create false evidence or obtain false testimony. 4 RT 931. The jury is presumed to have followed its instructions. <u>See</u> <u>Weeks</u>, 528 U.S. at 234 ) (citing <u>Richardson</u>, 481 U.S. at 211).

In sum, the Court cannot conclude that the state appellate court's rejection of Petitioner's <u>Bruton</u> claim was an unreasonable application of federal law. Petitioner is therefore not entitled to habeas relief on this claim.

///
///
///
///
///
///

# IV.

## CONCLUSION

For the reasons discussed in detail above, the Petition is denied and the action is dismissed with prejudice.

Dated:   October 9, 2015

_____
DOUGLAS F. McCORMICK
United States Magistrate Judge